GALVESTON, H. & H. R. CO. v. HODNETT.
(No. 6972.)

(Court of Civil Appeals of Texas. Galveston.
Nov. 9, 1915. Rehearing Denied
Dec. 16, 1915.)

1. APPEAL AND ERROR ☞1060—TRIAL ☞120—ARGUMENT OF COUNSEL—PREJUDICIAL EFFECT—DUTY OF COURT.

For plaintiff's counsel in argument to the jury to say, relative to cross-examination by M., another counsel for plaintiff, of L., seeking an admission that L. had made a statement to M. contrary to his testimony, that there is a prejudice against lawyers going on the stand in their own cases about matters to which witnesses have testified, to dispute them, and that M. would as soon jump out of the window as to have been guilty of putting questions to a witness to deceive any one into believing that the witness had admitted to him what agreed with his theory of the case, was, in effect, an assertion, without evidence to justify it, that the witness had testified to facts directly variant from his former statements, constituting improper conduct, likely prejudicial, so that the court, on objection, should have arrested the argument and directed the jury to disregard it.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4135; Dec. Dig. ☞1060; Trial, Cent. Dig. §§ 285–287; Dec. Dig. ☞120.]

2. TRIAL ☞118—ARGUMENT OF COUNSEL.

So far as argument of counsel, in a case submitted to the jury on special issues, explains to the jury the legal effect of their answers, it is improper.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 290–293; Dec. Dig. ☞118.]

Appeal from District Court, Harris County; Norman G. Kittrell, Special Judge.

Action by W. J. Hodnett against the Galveston, Houston & Henderson Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

See, also (Sup.) 163 S. W. 13.

Baker, Botts, Parker & Garwood, C. L. Carter, and Walter H. Walne, all of Houston, for appellant. John Lovejoy and Presley K. Ewing, both of Houston, for appellee.

McMEANS, J. This suit was brought by W. J. Hodnett against the Galveston, Houston & Henderson Railroad Company, for damages on account of personal injuries alleged to have been received on the 19th day of August, 1910. At the time of the accident appellee was a section foreman in appellant's employ, and, with a gang of Mexicans under his direction, was engaged at the time in unloading steel rails from a flat car. The accident happened early in the morning, shortly after the plaintiff began work. To do this work, an engine was coupled onto either two or three cars, one of which was a flat car loaded with steel. The appellee and those working under him were standing on the flat car. The flat car was moved, in each instance, a distance of a rail's length, approximately 30 feet, two rails were thrown off, after which the engine and cars were then moved the proper distance, where two more rails were unloaded. After a number

of stops had been made, the plaintiff was standing on the end of the flat car furthest from the engine, and when the car came to a stop he fell to the ground. The gravamen of the plaintiff's complaint was that, being in the employment as section foreman of the defendant, a corporation operating a railroad in this state, and in the ordinary discharge of his duties, he was jerked from the car and injured, and that such fall and injury was due to the negligence of the defendant: (a) In handling the train and car so that the car came to an unnecessarily sudden and abrupt stop, and consequent bump and jerk back; and (b) in failing to maintain the drawhead of one of the cars in a reasonably safe condition, so that it was defective, and admitted of undue slack. Appellant defended on the theory that there was no slack in the cars and no rough handling, but that the plaintiff became overbalanced and fell from the car, without any negligence on appellant's part. A trial before a jury resulted in a verdict and judgment in plaintiff's favor for $8,650, from which the defendant has appealed.

[1] Appellant's fifth assignment of error is as follows:

"The court erred in failing to charge the jury to disregard, and in failing to reprimand counsel for the use of, the following language used by plaintiff's attorney in his opening argument to the jury: 'Now, I say, but do not say because I am associated with Maj. Lovejoy—for any man in Houston or elsewhere in the state, knowing Maj. Lovejoy, knows of his high and honorable character—that Maj. Lovejoy would as soon have jumped out of that window as to have been guilty of putting questions here to a witness to deceive or mislead anybody into believing the witness had admitted to him what agreed with his (the major's) version of the case.' Because the language used with reference to Maj. Lovejoy was not warranted by any facts in evidence, was an effort on the part of plaintiff's attorney to impeach the witness Lancaster by the acts and conduct of Maj. Lovejoy during the trial of the case, contrary to any of the known rules for impeaching the witness of an adversary, and was an effort to substitute the virtues attributed to Maj. Lovejoy for legal evidence."

On the trial, while the defendant's witness, Lancaster, was on the stand and testifying on cross-examination, the examination being conducted by Maj. Lovejoy, one of plaintiff's attorneys, the following questions were asked by counsel and answers made by the witness:

"Q. Didn't you say to Hodnett that you got a hard fall, and it is a wonder they didn't kill every man on that car? A. No, sir. Q. Didn't you call afterwards at St. Joseph's Hospital to see Hodnett? A. No, sir. Q. Up here in this city? A. No, sir. Q. He called to see you, didn't he; you were up there sick? A. I was hurt. Q. Up in St. Joseph's hospital? A. Yes, sir. Q. And didn't you and Hodnett again talk over the way in which he was thrown off of that car? A. No, sir. Q. And didn't you say up there that 'it is a wonder it didn't kill every man on that car'? A. No, sir. Q. Mr. Lancaster, didn't you tell Mr. Hodnett that he could call on you at any time in undertaking to maintain his rights for the injuries he said

he had sustained, and that you would testify to that in court? A. Not as I remember of. Q. Didn't you express your sympathy with him, and tell him that there was no necessity of that man handling that engine in that way, and that he ought to recover? A. I might have expressed my sympathy with him for being hurt. Q. You went to see Mr. Hodnett when he was in his room there? A. No, sir. Q. Did you ever talk with anybody else about how Mr. Hodnett was thrown off of that car? A. No, sir. Q. You are certain of that? A. Yes, sir. Q. Did anybody connected with Mr. Hodnett's case ever ask you to tell them how he was hurt? Stop a minute and refresh your memory. A. I had a little talk with Mr. Hodnett about a year afterwards. I met him on Main street here, and asked him how he was getting along, and he said very well, considering. Q. And did you go with him to any lawyer's office? A. No, sir. Q. Did you ever tell any of his lawyers how he was hurt; how he was jerked off that train? A. Not as I know of. Q. Are you certain of that? A. Yes, sir. Q. Didn't you tell me that you would come here at any time I would notify you if I would pay your expenses and your time, and that you would come here and testify for Mr. Hodnett? A. I don't remember that. Q. Didn't you come to my office and volunteer that statement? A. No. Q. When you got hurt, I represented you, didn't I? A. Yes, sir. Q. Didn't we talk over how Mr. Hodnett got hurt, and something about his case? A. Yes; I believe so. Q. All I want to do is refresh your memory. Didn't you, on more than one occasion, offer to make a written statement for me in this case, to the effect that Mr. Hodnett was jerked off of that train down there, and hurt because of the way in which that engine was handled? Now stop one minute and think. A. Put the question to me again. Q. Did you offer to make a statement in writing that you would testify to it that Mr. Hodnett was thrown off of that car down there and hurt because of the violent way in which that engine was handled? A. No, sir. Q. You talked about it, didn't you? A. I talked to you regarding the case. Q. Didn't you offer to come here and testify in the case for Mr. Hodnett that he was thrown off of that car down there and hurt by the violent way in which the engine was handled, at any time that we would pay your expenses and pay you for your time? A. No, sir. Q. Are you certain of that? A. Certain. Q. You told him that you would testify in his case, didn't you? A. I told him I would testify in his case, yes. Q. What did you offer to testify in his case for if you didn't know that your testimony would be in his interest? Didn't you tell Mr. Hodnett that you would come here and testify in his case any time he would let you know? A. No, sir. Q. You said awhile ago that you told him that you would come here and testify; you said that awhile ago? A. No, sir. Q. Didn't you tell me you would testify in his case? A. No, sir; not as I remember. Q. What were you talking to me about it for, then? A. You were asking me some questions in regard to it. Q. Mr. Lancaster, didn't you say—didn't I tell you what Mr. Hodnett had said; that you had said to him—didn't I repeat this to you at that time? That Mr. Hodnett told me that you had told him, when you picked him up and asked him if he was hurt, that it was a wonder that they hadn't killed every man on that car? A. Not as I remember of. Q. And didn't you say that you did say that to him, and that it was a wonder they didn't kill them? A. No, sir. Q. And you did talk to me about it, and you did agree to come here and testify if I would pay your expenses? A. No, sir. Q. Didn't you agree to let me know where your address was? A. No, sir. Q. Did you give any reason to me why, or what I must do in addition to that in order to get you to testify? A. No, sir. Q. Mr. Hodnett, didn't you, down at the hospital here, St. Joseph's Hospital— No, I will ask you this: Do you know whether—one of the box cars there—one, anyhow, was an M., K. & T. car, wasn't it? A. I don't remember the initial. Q. Do you know where they picked it up? A. I don't remember where we got it. Q. Didn't you tell Mr. Hodnett down in the hospital, when he went down to see you, that when you did testify in this case, you would show that both drawheads on that car were in bad order, and that you would tell where they got it from? A. No, sir. Q. Was anything said of the car, that you recollect of? A. No, sir. Q. You don't recollect anything that was said about it? A. There was nothing said about it as I remember."

In the opening argument to the jury Mr. Presley K. Ewing, also counsel for plaintiff, made use of the following language:

"Take Lancaster. He didn't testify on the former trial, but he did testify on this trial. You heard the major's (reference to Maj. Lovejoy, one of the plaintiff's attorneys) questions to him. You know, of course, and you are entitled to know, of the prejudice against lawyers going on the stand in their own cases about matters to which witnesses have testified to dispute them. It is simply regarded as not professional to do it. I do not mean to say but that at times we may, and some of us do, testify to important matters, but not generally. Now, I say, but do not say because I am associated with Maj. Lovejoy—for any man in Houston or elsewhere in the state, knowing Maj. Lovejoy, knows his high and honorable character—that John Lovejoy would as soon have jumped out of that window as to have been guilty of putting questions here to a witness to deceive or mislead anybody into believing the witness had admitted to him what agreed with his (the major's) version of the case."

Whereupon the defendant's attorney, without interrupting counsel for the plaintiff, called the attention of the court to the remarks of counsel with reference to Maj. Lovejoy and his questions to the witness and excepted thereto, but the court took no action with reference to the argument made or the exception thereto. The witness Lancaster, on direct examination, had testified:

"I was present down there at the time when Mr. Hodnett had a fall from a flat car. * * * The train consisted of a box car and a flat car and the engine. Mr. Hodnett was on the end of the flat car; the train was headed east; the flat car was in front going east, then came the box car. * * * There were two cars in that string, a flat car and a box car. I saw Mr. Hodnett as he was falling. * * * At the time he fell the engine and cars had come to a stop—just about the same kind of a stop we had been making for 15 or 20 stops before. I did not notice any sudden stop with a jerk. I did not notice any more slack in the drawheads of those cars than is usual. * * * The speed at which that train was moving at the time the accident happened was so slight that it would be hard to estimate it. * * * After we finished unloading the steel, Smith did not give us any instructions to put a bad-order box car on the repair track out of this train. There were no bad-order cars on this train, not as I know of; we had no bad-order cars in it."

The argument complained of was not only improper, but in our opinion extremely prejudicial to defendant. To make the truth of this statement apparent, it is only necessary to say that Hodnett, the plaintiff, alone testified to the rough handling of the train and the unusual slack due to the defective-

ness of the drawheads in one of the cars, to each of which he attributed his fall and consequent injury, while five or six witnesses, all of whom were then employés of the defendant, and some of whom were in its employment at the time of the trial, testified that there was no rough handling and no unusual slack. Thus the fact issues were sharply drawn, and the testimony, in point of number of witnesses, greatly preponderates against the plaintiff's theory of the cause of his injury. We do not mean to be understood as holding that the verdict was so manifestly against the great weight and preponderance of the testimony as to authorize the court to set it aside; for that question we do not decide, and in view of the disposition we shall make of this appeal, it would be improper to now decide it. But it is our opinion that in the circumstances stated the effect of the argument was calculated to convince the jury that Lancaster had made statements to Maj. Lovejoy wholly at variance with his testimony and corroborative of plaintiff's theory of the case, and that the only reason that Maj. Lovejoy did not take the stand and by his testimony impeach the witness was because of the—

"prejudice against lawyers going on the stand in their own cases about matters to which witnesses have testified to dispute them."

To say in direct connection with the language used as above quoted that Maj. Lovejoy "would as soon have jumped out of that window as to have been guilty of putting questions here to a witness to deceive or mislead anybody into believing the witness had admitted to him what agreed with his (the major's), version of the case" was in effect an assertion, without evidence to justify it, that the witness had testified to facts directly variant from his former statements; and the probable, if not the necessary, effect of this was to induce the belief in the minds of the jury that he had sworn falsely, and this was calculated to cast suspicion upon the testimony of all of defendant's witnesses with which the testimony of Lancaster agreed. We readily accept as true the statement of counsel that he made the argument merely to relieve his associate from a possible wrong impression of his act by the jury, and not with any thought of having the jury think that the plaintiff could get benefit from the statements of the witness inquired about when unproved. The lofty character of the distinguished and able counsel acquits him in the mind of this court of any intention to mislead or deceive the jury, and it is probable that the fact of his prominence gave greater weight to his statements with the jury; but we cannot look to the intention of the counsel in making the argument, but only to the probable effect it had upon the jury in determining the weight of the evidence; and, believing, as we do, that the argument was extremely prejudicial to defendant, it is our opinion that the trial judge erred in failing to arrest the argument when his attention was called to it and in not instructing the jury to disregard it, and that this error requires a reversal of the judgment.

[2] Appellant by its sixth assignment complains that:

"The court erred in failing to instruct the jury to disregard, and in failing to reprimand counsel for his closing statement to the jury as to how they should answer the special issues submitted to them by the court if they wanted plaintiff to recover."

Under this assignment the following proposition is advanced:

"Where a case is submitted to a jury on special issues, it is reversible error for the court to permit counsel, without rebuke, to advise the jury in his argument what the legal effect of their answer will be."

The case was submitted to the jury on special issues in the form of interrogatories. During the argument plaintiff's counsel used the following language:

"We claim that every question submitted here to you should be answered, 'Yes,' down to the question for damages, and we submit to you that the question for damages should be answered in the amount that you find, and we submit that all of the questions after the questions for damages there should be answered, 'No,' if you want the plaintiff to recover and believe he ought to recover; that is the way we want you to answer it."

Without interrupting the attorney in his argument the defendant's attorney called the court's attention to the argument, and excepted to it on the ground that it was an effort of counsel to explain to the jury the legal effect of their answers to the special issues submitted; but the court did not instruct the jury in reference thereto. It seems to us that the argument went far toward explaining to the jury the legal effect of their answers, and to the extent it went in this direction the argument was improper. In Fain v. Nelms, 156 S. W. 281, this court had occasion to pass upon a similar question and there held that the argument, under the circumstances of that case, was improper, and that the court should have stopped it when attention was called to it. In writing the opinion of the court our late Associate Justice Reese uses the following language:

"The jury, as triers of fact solely, had nothing to do with the legal effect of their findings, This was a matter which could not properly concern them. They were only to find the facts. The argument came very near a direct invitation to the jury to consider, in finding this fact, what the legal effect would be. The argument should not have been made, nor should the court have allowed it to be made, and to give tacit approval of it by disregarding appellant's objection."

We adhere to the ruling in the Fain Case, and will continue to do so until convinced of its erroneousness by reasoning more cogent than that offered by appellee's attorneys. Nor can we agree with appellee's attorneys that in that case we indulged in reasoning to be "deplored."

However, as the judgment must be reversed

for the error hereinbefore discussed, and as the error here complained of will not likely arise upon another trial, we do not think it necessary to commit ourselves upon the question as to whether the error, under the facts of this case, requires a reversal.

We have examined all the other assignments of error presented by appellant in its brief, and are of the opinion that none of them points out reversible error. 'For the error first indicated, the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.